[No. G019753. Fourth Dist., Div. Three. Nov. 26, 1996.]

WILLIAM STEINER, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party In Interest.

[No. G019808. Fourth Dist., Div. Three. Nov. 26, 1996.]

ROGER STANTON, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party In Interest.

Stokke & Riddet, Allan H. Stokke, John D. Barnett, Wylie A. Aitken, La Barbera & Myers, Vincent La Barbera and William J. Kopeny for Petitioners.

No appearance for Respondent.

Michael R. Capizzi, District Attorney, Maurice L. Evans, Chief Assistant District Attorney, and Gregory J. Robischon, Deputy District Attorney, for Real Party in Interest.

**WALLIN, J.**—William Steiner and Roger Stanton petition for writs of mandate/prohibition,[1] contending the trial court erroneously overruled their objections to the accusations filed against them pursuant to Government Code section 3060.[2] We grant the writs.

The district attorney seeks to unseat Steiner and Stanton as Orange County supervisors. He took this action under section 3060 after another elected

---

[1]Steiner and Stanton filed separate petitions, but we ordered them consolidated.

[2]All statutory references are to the Government Code unless otherwise indicated. Section 3060 provides in relevant part: "An accusation in writing against any officer of a . . . county . . . for willful or corrupt misconduct in office, may be presented by the grand jury of the county for or in which the officer accused is elected or appointed. An accusation may not be presented without the concurrence of at least 12 grand jurors." Section 3069 reads: "If the defendant pleads guilty, or refuses to answer the accusation, the court shall render judgment of conviction against him. If he denies the matters charged, the court shall immediately, or at such time as it appoints, try the accusation." Section 3070 reads: "The trial shall be by a jury, and conducted in all respects in the same manner as the trial of an indictment." Section 3072 provides in relevant part: "Upon a conviction and at the time appointed by the court it shall pronounce judgment that the defendant be removed from office."

official, County Treasurer Robert Citron, made speculative high-stakes financial investments, which suffered a precipitous downturn and plummeted the county into bankruptcy.

The district attorney instituted proceedings before the grand jury, which issued substantially identical accusations[3] against Steiner and Stanton, alleging, in essence, they failed to adequately carry out their duties to supervise Citron and other county officials. The accusations are divided into four sections, lettered "A" to "D."

Section A alleges Steiner and Stanton jeopardized the county's financial health by violating their duties to protect county finances under sections 23005,[4] 25207,[5] and 25303.[6] It alleges they voted in 1993 and 1994 to issue short-term notes of approximately one and a half and two times the amount of discretionary revenue for those years respectively without adequate inquiry as to the necessity of borrowing, utilization of the proceeds, safety of the investment, ability of the county to repay the debt, and reliability of the pledged revenue stream.

Section B alleges Steiner and Stanton violated their duties under section 25303 by failing to adequately supervise Citron and his successor, Matthew Raabe, and to see that they faithfully performed their duties. It alleges Steiner and Stanton failed to read and analyze the treasurer's monthly investment reports under section 53607,[7] to adequately monitor the treasurer's activities and to communicate regarding investments, inquire into interested third parties' accusations concerning risk and the possibility of loss, actively and adequately investigate the treasurer's investment practices, offer

---

[3]An accusation is the form of pleading used pursuant to section 3060 to oust certain government officials for misconduct in office. We shall explain the procedures below.

[4]The section reads: "A county may exercise its powers only through the board of supervisors or through agents and officers acting under authority of the board or authority conferred by law."

[5]The section reads: "The board may do and perform all other acts and things required by law not enumerated in this part, or which are necessary to the full discharge of the duties of the legislative authority of the county government."

[6]The section reads in relevant part: "The board of supervisors shall supervise the official conduct of all county officers . . . particularly insofar as the functions and duties of such county officers . . . relate to the . . . safekeeping, management, or disbursement of public funds. It shall see that they faithfully perform their duties, direct prosecutions for delinquencies, and when necessary, require them to renew their official bond, make reports and present their books and accounts for inspection."

[7]The section reads in relevant part: "The authority of the legislative body to invest or to reinvest funds of a local agency, or to sell or exchange securities so purchased, may be delegated by the legislative body to the treasurer of the local agency, who shall thereafter assume full responsibility for such transactions until such time as the delegation of authority is revoked, and shall make a monthly report of such transactions to the legislative body."

assistance to county staff in analyzing or solving problems in the treasury and investment pool, adequately investigate problems with the pool, and take action to enable Raabe and other staff members to attempt solutions to the financial crisis in the pool.[8]

Section C alleges Steiner and Stanton violated their duties under section 25303 by failing to adequately supervise Auditor-Controller Steve Lewis, and to see he faithfully performed his duties. It alleges that although they had the authority under section 26883,[9] they failed to require Lewis to perform audits and prepare and file reports on the treasurer's accounts and records to assure he was performing his duties to preserve and safeguard public moneys under section 53649.[10]

Section D alleges Steiner and Stanton violated their duties under section 25303 by failing to require reports from county administrative officer Ernie Schneider necessary to adequately supervise Citron, Lewis, and Schneider, and to see they faithfully performed their duties. It alleges Steiner and Stanton failed to ensure that Schneider controlled and screened board agendas to ensure important matters regarding the safekeeping, management and disbursement of public funds were brought to the board's attention for public and open discussion on the board's discussion calendar.

In a nutshell, the accusations assert Steiner and Stanton did a shoddy job of minding the store while Citron committed acts which plunged the county into bankruptcy. Steiner and Stanton filed objections to the accusations,[11] and the trial court granted them as to section A, but denied them as to the other sections. In this proceeding they contend the accusations: (1) do not state facts constituting willful misconduct; (2) violate the constitutional principles of separation of powers and legislative immunity; (3) assert a

---

[8]In the only material variations in the accusations, Steiner's accusation alleges he failed to inquire about and learn his duties as supervisor, while Stanton's accusation did not, and Stanton's accusation alleges he made deliberate attempts to distance himself from responsibility for the investment pool and urged others to do so, while Steiner's accusation did not.

[9]The section provides in relevant part: "[T]he board [of supervisors] shall have the power to require that the county auditor-controller shall audit the accounts and records of any department [or] office . . . whose funds are kept in the county treasury. The county auditor-controller's report on any such audit shall be filed with the board of supervisors and, if the report discloses fraud or gross negligence a copy thereof shall be filed with the district attorney."

[10]Section 53649 provides in relevant part: "The treasurer is responsible for the safekeeping of money in his or her custody."

[11]Section 3066 provides: "If [the accused] objects to the legal sufficiency of the accusation, the objection shall be in writing. The objection need not be in any specific form. It is sufficient if it presents intelligibly the grounds of the objection." The objection may be, as here, in the nature of a demurrer. (*People* v. *Hale* (1965) 232 Cal.App.2d 112, 119-120 [42 Cal.Rptr. 533].)

nonexistent duty to act individually; and (4) are impermissibly vague and nonspecific.[12] We find the first two contentions have merit, so we do not address the others.[13]

I

██ Steiner and Stanton contend the alleged acts do not constitute the "willful misconduct" required to trigger removal from office under section 3060 et seq. We agree.

Cases construing section 3060 consistently reiterate the proposition "willful misconduct" only requires a volitional act or failure to act. (See, e.g., *People* v. *Hawes* (1982) 129 Cal.App.3d 930, 938 [181 Cal.Rptr. 456]; *Mazzola* v. *City and County of San Francisco* (1980) 112 Cal.App.3d 141, 149-150 [169 Cal.Rptr. 127]; *People* v. *Hale, supra,* 232 Cal.App.2d at pp. 118-119; *People* v. *Mullin* (1961) 197 Cal.App.2d 479, 486 [17 Cal.Rptr. 516]; *People* v. *Elliott* (1953) 115 Cal.App.2d 410, 419-420 [252 P.2d 661].) This construction of section 3060 goes back to *Coffey* v. *Superior Court* (1905) 147 Cal. 525 [82 P. 75], where the court observed the phrase " 'misconduct in office' is broad enough to include any willful malfeasance, misfeasance, or nonfeasance in office[,] . . . " even if it is not accompanied by any "criminal intention." (*Id.* at p. 529.)[14]

But despite these pronouncements, the cases require more serious misconduct. The late eminent scholar Bernard Witkin recognized as much. We set

---

[12]Each of these contentions is cast somewhat differently by Steiner and Stanton, but we state their gist. Steiner also contends the trial court improperly failed to take judicial notice of the board's resolution delegating investment power to Citron under section 53607, and the district attorney's " 'motion to reconsider' the sustaining of the demurrer [*sic*] as to paragraph A is jurisdictionally out of time and is without merit." The first of these contentions is really a subissue of the constitutional argument, and the second is not germane to this petition.

[13]We note without deciding, however, the last two contentions appear to have merit as well. For example, many, if not all, of the allegations involve a failure to act on matters that would require a majority vote or collective action of the board. (See, e.g., § 25303 [*"The board of supervisors* shall supervise . . . ." (Italics added.)]; § 25005 [requiring a quorum to conduct official business].) And, the accusations are arguably vague and ambiguous because they allege, in essence, failures to adequately perform certain duties of a supervisor without suggesting how and by how much the supervisors fell short of the mark.

[14]Steiner cites authority holding "willful misconduct" requires "bad faith." (*Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 877 [42 Cal.Rptr.2d 606, 897 P.2d 544]; *Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 622 [175 Cal.Rptr. 420, 630 P.2d 954]; see also *Dodds* v. *Commission on Judicial Performance* (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) But those cases were decided under California Constitution, article VI, section 18, which deals exclusively with removal of judges. Although article VI, section 18 and section 3060 arise from the same constitutional source, the bad faith requirement under the former provision arose independently from the source.

Both provisions sprang from former article IV, section 18 of the California Constitution, which provided, among other things, that "judges . . . shall be liable to impeachment for any

forth his cogent analysis at length: "Since the punishment is only removal from office, it has been said that the 'misconduct' need not constitute a violation of any specific criminal statute. [Citations.] [¶] It is, however, difficult to conceive of an act constituting 'wilful or corrupt misconduct in office' which does not violate one of the long list of crimes of public officers . . . or the many prohibitions in local ordinances. And the cases, though few and not helpful in their discussions of this point, almost invariably deal with

---

misdemeanor in office," and "[a]ll other [lesser governmental officials] shall be tried for misdemeanor in office in such manner as the Legislature may provide." (Cal. Const., former art. IV, § 18; see Webster's New Internat. Dict. (3d ed. 1981) p. 1443 ["misdemeanor" is "misbehavior," "an act of bad conduct"]; see also *Coffey* v. *Superior Court, supra,* 147 Cal. at p. 529 [noting Webster defines "misconduct" as synonymous with "misdemeanor"].) Article IV, section 18 begat Penal Code section 758, the precursor of section 3060, which contained almost identical language. (See *People* v. *Hale, supra,* 232 Cal.App.2d at p. 119.)

When the present version of article IV, section 18 was enacted in 1966, providing for impeachment of judges for "misconduct," article VI, section 18 was also enacted. It states, in relevant part, the Commission on Judicial Performance may "remove a judge for action . . . that constitutes willful misconduct in office, persistent failure or inability to perform the judge's duties, habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." Because the original constitutional source of the two provisions is the same and both use the term "misdemeanor in office," one might conclude the meaning of the term "willful misconduct" in section 3060 and article VI, section 18 involves the same mental state, bad faith.

But in *Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270 [110 Cal.Rptr. 201, 515 P.2d 1], the case that gave rise to the bad faith requirement for removing judges, the court observed, "As indicated above, the Commission in the instant matter concluded that the conduct proven in the previously discussed specifications constituted 'willful misconduct in office' and 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' As we have noted above, the second ground for imposing discipline was added to the Constitution in 1966. We believe this mandates our construing 'willful misconduct in office' as connoting something graver than the 'lesser included offense' of 'conduct prejudicial to the administration of justice that brings the judicial office into disrepute.' The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." (*Id.* at pp. 283-284.)

Because the *Geiler* court premised its construction requiring bad faith for willful misconduct on the presence of a "lesser included offense" in article VI, section 18, and section 3060 describes no such lesser offense, we hesitate to conclude bad faith is required for a section 3060 violation. (But see, e.g., *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274] [when provisions are enacted contemporaneously, the rule that statutes in pari materia, containing similar phrases, should be construed together is most justified] overruled on other grounds in *People* v. *Escobar* (1992) 3 Cal.4th 740, 749-750 [12 Cal.Rptr.2d 586, 837 P.2d 1100].) One could forcefully argue "willful misconduct" requires bad faith only when it appears in a provision listing another sort of misfeasance, such as "conduct prejudicial to the administration of justice." The cogent counterargument is, however, the addition of a "lesser included offense" in the new constitutional provision could not make the term mean something it had not before, i.e., that it could have added the bad faith requirement to "willful misconduct." We need not resolve these arguments because we shall find section 3060 requires more than a mere volitional act or omission without regard to other provisions.

acts which are prohibited by statute or ordinance. [Citations.] [¶] The opinions are also unclear on the mental element required. In *People* v. *Harby* [(1942) 51 Cal.App.2d 759, 767 (125 P.2d 874)], the court said: 'Such official misconduct does not necessarily imply corruption or criminal intention. The officer who, by the exercise of the power of his office, does an act forbidden by a penal statute is guilty of the conduct contemplated.' And the earlier opinion in *Coffey* v. *Superior Court, supra*, 147 [Cal. at p.] 529, uses similar language: '[M]isconduct in office does not necessarily imply corruption or criminal intention. The official doing of a wrongful act, or official neglect to do an act which ought to have been done, will constitute the offense, although there was no corrupt or malicious motive.' [Citation.] [¶] These statements, however, appear in cases in which the defendant knowingly violated a criminal statute, and there was, therefore, some kind of criminal intent. [Citations.]" (2 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against Governmental Authority, § 1219, pp. 1396-1397; see also *Mazzola* v. *City and County of San Francisco, supra*, 112 Cal.App.3d at p. 150, citing the text with approval.)

We have reviewed the cases dealing with section 3060 and conclude Witkin is correct. In the seminal case, *Coffey* v. *Superior Court, supra*, 147 Cal. at page 530, the court upheld a police chief's ouster for failing to seek prosecution of an illegal gambling ring even though the evidence did not show a corrupt intention or bad faith. But in reaching this result, the court observed, "The accusation . . . charges . . . [Coffey] knew of [the unlawful gaming], and refused and failed to prosecute the offenders. . . . *It was not a mere neglect of duty.* It was a failure to discharge his duty with knowledge of the facts calling for official action; a failure which was willful, and which evidenced a fixed purpose not to do what *actual knowledge* and the requirements of the law declare he shall do." (*Ibid.*, italics added.) Thus, *Coffey*, the font of section 3060 cases, engrafted a knowledge element to the required mental state. None of the cases that came after *Coffey* contravenes that principle.

In *People* v. *Harby, supra*, 51 Cal.App.2d 759, the defendant, a city councilman, was accused of willfully, fraudulently, and corruptly taking a city car on a long vacation trip, in violation of a city ordinance on which he had voted prohibiting private use of a county car. (*Id.* at pp. 763-765.) Although the Court of Appeal recited the litany of *Coffey* v. *Superior Court, supra*, 147 Cal. 525 concerning the mere doing of a wrongful act, the evidence was sufficient to show knowledge of the wrong. (51 Cal.App.2d at pp. 767-768.) In *People* v. *Becker* (1952) 112 Cal.App.2d 324 [246 P.2d 103], Becker received portions of insurance premiums for policies insurance companies provided for the school district on whose board Becker sat. The

court found Becker could be ousted even though he had legal advice his conduct was proper. The court noted he violated the express terms of a statute prohibiting conflicts of interest, and the evidence was susceptible to the inference Becker intentionally omitted material facts in obtaining the legal opinion. (*Id.* at pp. 325-326.) In *People* v. *Elliott, supra,* 115 Cal.App.2d 410, another contract conflict of interest case, the court cited the standard definition of "willful" but expressly found the conduct was corrupt. (*Id.* at p. 419-420.)

In *People* v. *Mullin, supra,* 197 Cal.App.2d 479, the court affirmed the removal of a sheriff from office after he forced a girl to go with her father, whom she accused of molesting her, provided no protection for her, and did not report the claim to the district attorney or juvenile authorities as the law required, even though the girl's aunt had corroborated the allegations. The father was eventually convicted of statutory rape of his daughter. In addressing a claimed instructional error, the court stated misconduct did not require corruption or criminal intention, but only a purpose or willingness to commit the act. The court also recognized, however, "[w]ilful misconduct is something more than an act or omission resulting from a mistake of judgment. . . ." (*Id.* at pp. 485-486.) The court found sufficient evidence Mullin willfully failed to investigate a crime, noting nonfeasance was sufficient to support the allegations. But in doing so, the court pointed to evidence Mullin destroyed eight pages of interview notes, and the jury could believe he intentionally suppressed or concealed them from prosecuting authorities. (*Id.* at pp. 487-488.)

In *People* v. *Hale, supra,* 232 Cal.App.2d 112, the court stated that an official may be removed for "gross and repeated failure to carry out his official routine . . . . Such misconduct . . . may be corrupt or *merely wilful.*" (*Id.* at p. 119, italics added.) Unfortunately, the court did not give meaning to the emphasized phrase. And, providing an example of how mixed up the characterizations of the requisite mental state can be, the court also noted, "[T]he misconduct referred to simply requires a purpose or willingness to . . . be guilty of the omission." (*Ibid.*) Willingness to be guilty of an omission is a term unknown to us in the law, but at the very least, it connotes a conscious decision not to act as opposed to mere negligent failure to act. In any event, the statements are dictum because the allegations were Hale *intentionally* covered up management and accounting irregularities in a waste disposal company holding the county's trash collection franchise, which employed him before he became the county auditor-controller. (*Id.* at pp. 115-116.)

In *People* v. *Hulburt* (1977) 75 Cal.App.3d 404 [142 Cal.Rptr. 190], a pleading case, the court noted section 3060 proceedings are not a criminal

prosecution in the ordinary sense. But Hulbert's alleged conduct constituted criminal felony violations, including that he used his authority and influence to force other sheriff's deputies to support the incumbent, allegations that connoted intentional misconduct. (*Id.* at p. 408.) In *People* v. *Superior Court* (*Hanson*) (1980) 110 Cal.App.3d 396, 401 [168 Cal.Rptr. 21], the court observed, "The act or omission for which an officer may be removed does not necessarily imply corruption or criminal intent or the commission of a crime in the ordinary sense of that term. [Citations.]" The court did not expound on the statement, probably because it was dictum. The comment occurs in the court's discussion of the different purposes of section 3060 proceedings and criminal actions, where the court concluded those accused under section 3060 are not so similarly situated with charged felons as to require a preliminary hearing. (*Id.* at pp. 400-401.) In *People* v. *Hawes*, *supra*, 129 Cal.App.3d at page 940, the court found intoxication during working hours was grounds for removal, affirmative conduct which connotes knowledge at least.

Taken as a whole, these cases affirm that something more than neglect is necessary to constitute willful conduct. Virtually all of them involved conduct that was otherwise criminal, conduct which was corrupt and malum in se. And, in contrast to Steiner's and Stanton's cases, none of them involved a failure to act where the duty to act is premised on something the official *should have known.* But that is what the district attorney has charged here. He alleges Steiner and Stanton failed to realize Citron's investment decisions could bring financial ruin to the county because they did not pay close enough attention to his activities.

One court, recognizing the term "willful" requires more than a volitional act or omission, found the alleged acts were insufficient to justify removal under section 3060. In *People* v. *Tice* (1956) 144 Cal.App.2d 750 [301 P.2d 588], a jury found Tice, the marshal, had issued county checks drawn on insufficient funds. (*Id.* at p. 751.) The uncontroverted evidence showed the checks were written by Tice's assistant and honored by the bank, without Tice's knowledge. In upholding the trial court's decision to grant a new trial, the Court of Appeal observed the concept of willfulness under section 3060 includes an element of knowledge: "[M]isconduct for which a public officer may be removed from office on accusation by a grand jury may be either wilful or corrupt. 'Wilfully,' in this connection, 'implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require an intent to violate law, or to injure another, or to acquire any advantage.' However, 'knowingly' requires 'knowledge that the facts exist which constitute the transgression.' [Citation.]" (144 Cal.App.2d at p. 754.)

*Tice* involved a situation analogous to Steiner's and Stanton's. Although Orange County residents undoubtedly would have been thankful had Citron's sin merely been to write a few bad checks, the alleged role of Tice and

the supervisors are the same: they allowed misfeasance on their watch. But the accusations here do not allege Steiner and Stanton knew of the misfeasance, and the district attorney conceded at oral argument the accusations allege only negligence.[15]

To adopt the district attorney's proposed negligence standard would have ominous public policy implications. It would effectively make the district attorney a performance monitor of elected officials, and allow him to subject them to the expense and rigors of accusation and trial if he deemed their performance to fall below that of the "reasonable" public official. In plain terms, he could try to oust them for getting a C minus on their report cards. We cannot believe the Legislature intended to give the district attorney that power when it enacted section 3060. The procedure must be reserved for serious misconduct, such as that found in the cases we have reviewed, misconduct that involves criminal behavior or, at least, a *purposeful* failure to carry out *mandatory* duties of office.[16] The allegations against Steiner and Stanton fall well short of that standard, and they should have been set aside.

## II

Even if Steiner's and Stanton's alleged nonfeasance fell within the ambit of section 3060, the district attorney would still face another barrier: the separation of powers doctrine. The California Constitution recognizes the doctrine in article III, section 3: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." In the context of federal separation of powers, the United States Supreme Court recognized, "If it be important thus to separate the several departments of government and restrict them to the exercise of their appointed powers, it follows, as a logical corollary, equally important, that each department should be kept completely independent of the others—

---

[15]The accusations mention allegations of investment risks and possible losses made against Citron by now-Treasurer James Moorlach and others which were conveyed to the supervisors, but the district attorney apparently concedes these allegations by private citizens, one of whom sought and ultimately assumed Citron's job, do not constitute allegations of knowledge. The accusations charge a failure to "actively and adequately inquire into, examine, and investigate" Moorlach's allegations, not a failure to act with knowledge they were true.

Stanton's accusation alleges he "made deliberate attempts to distance himself from responsibility for the [investment] pool and urged others to do so." Although this allegation involves affirmative conduct, the district attorney does not expressly allege the conduct was wrongful. The allegation merely forms part of the purported factual basis supporting the general claim he "wilfully failed to actively and adequately inquire, examine and investigate the operations of the Treasurer."

[16]This construction would help ameliorate the separation of powers problem we discuss in the next part.

independent . . . in the sense that the acts of each shall never be controlled by, or subjected, directly or indirectly, to, the coercive influence of either of the other departments." (*O'Donoghue* v. *United States* (1933) 289 U.S. 516, 530 [77 L.Ed. 1356, 1360, 53 S.Ct. 740].)

This concept manifests itself in various ways. ■ For example, courts may not compel a legislative body to act. In *Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616, 618 [230 Cal.Rptr. 42], the court held taxpayers could not invoke judicial power to force the Franchise Tax Board, an administrative body, to control the use of alcohol entertainment expenses as a business deduction on state income tax returns. In doing so the court noted " 'the well-established principle, rooted in the doctrine of separation of powers [citation], that the courts may not order the Legislature or its members to enact or not to enact, or the Governor to sign or not to sign, specific legislation.' [Citation.] . . . '[B]y virtue of the separation of powers doctrine courts lack the power to order the Legislature to pass a prescribed legislative act.' [Citation.] . . . Were it otherwise, courts would be involved in 'an attempt to exercise legislative functions, which . . . is expressly forbidden . . . .' [Citations.]" (*Id.* at p. 624; see also *Mandel* v. *Myers* (1981) 29 Cal.3d 531, 551, fn. 9 [174 Cal.Rptr. 841, 629 P.2d 935]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 751 [135 Cal.Rptr. 345, 557 P.2d 929]; *Hicks* v. *Board of Supervisors* (1977) 69 Cal.App.3d 228, 235 [138 Cal.Rptr. 101].)

An equally important corollary of the separation of powers doctrine is courts cannot inquire into the impetus or motive behind legislative action. (*County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726 [119 Cal.Rptr. 631, 532 P.2d 495]; *City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898 [120 Cal.Rptr. 707, 534 P.2d 403].) *Board of Supervisors* v. *Superior Court* (1995) 32 Cal.App.4th 1616 [38 Cal.Rptr.2d 876], typifies the proposition. A judges' association brought suit to challenge the board of supervisors' decision to consolidate court services in the sheriff's department on the ground the board did not consider the judges' "advisory recommendation," as is statutorily mandated. The court reversed an order allowing discovery to determine whether the board had considered the recommendation. (*Id.* at p. 1619.)

In doing so, the court acknowledged the applicability of the separation of powers doctrine (32 Cal.App.4th at p. 1626), and reasoned, "Judicial reluctance to explore the thought process of legislators emerged very early in American jurisprudence. The California Supreme Court [citation] [has] called *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87 [3 L.Ed. 162] 'the classic statement of the policies behind the rule.' Even when a legislature

stood accused of corruption in its lawmaking, Chief Justice Marshall wrote: 'It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements, operating on members of the supreme sovereign power of a state, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded, that an act of the supreme sovereign power might be declared null by [a] court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect. Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment? [¶] If the majority of the legislature be corrupted, it may well be doubted, whether it be within the province of the judiciary to control their conduct, and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated, is not clearly discerned.' [Citation.]" (*Board of Supervisors* v. *Superior Court, supra*, 32 Cal.App.4th at p. 1623.)

A third corollary of the separation of powers doctrine as it impacts legislatures is legislators have absolute immunity from damage suits based on legislative acts. (*Cinevision Corp.* v. *City of Burbank* (9th Cir. 1984) 745 F.2d 560, 577.) In *Traweek* v. *City and County of San Francisco* (N.D.Cal 1984) 659 F.Supp. 1012 (affd. as mod. on another point in *Traweek* v. *City and County of San Francisco* (9th Cir. 1990) 920 F.2d 589), the court applied the rule to hold city and county officials could not be forced to sponsor or enact legislation that would alter existing legislation. (659 F.Supp. at p. 1031.) In doing so, the court held the rule applied to immunity from damages as well as declaratory or injunctive relief. (*Id.* at p. 1030.) The court rejected the contention the conduct about which the plaintiffs complained consisted of nonlegislative administrative acts, such as meeting with lobbyists and interests groups, noting " 'long-standing and wise [is the] tradition that legislators are immune from legal responsibility for their intra-legislative statements *and activities*.' [Citation.]" (*Ibid.*, italics added.) The court elaborated, "The doctrine of absolute legislative immunity has been construed expansively. . . . [T]he privilege protects not only the conduct of municipal legislators, but also the acts of municipal administrators and executives 'taken in direct assistance of legislative activity.' [Citation.]" (*Ibid.*;[17] see also *Lake Country Estates* v. *Tahoe Planning Agcy.* (1979) 440 U.S. 391, 406 [59 L.Ed.2d 401, 413, 99 S.Ct. 1171] [absolute immunity

---

[17]The court also found the result would be the same under California law because "state law mirrors federal law in this area." (659 F.Supp. at p. 1033.)

for planning commissioners; immunity is needed to protect "the public good"].)[18]

■ These corollaries of the separation of powers doctrine regarding legislative acts apply to local government bodies, including boards of supervisors, when they act in a legislative capacity. (*County of Los Angeles* v. *Superior Court, supra,* 13 Cal.3d at p. 726 [legislative motivation]; *City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 395-396 [3 Cal.Rptr. 796] [legislative inaction]; *Cinevision Corp.* v. *City of Burbank, supra,* 745 F.2d at p. 577.) Synthesizing the rules, we conclude legal action may not be taken against supervisors for their activities involving planning or enacting legislation. And, because the revocation of legislative action is itself legislative (*Santa Barbara County Taxpayers Assn.* v. *Board of Supervisors* (1989) 209 Cal.App.3d 940, 946-947 [257 Cal.Rptr. 615]; *Hilton* v. *Board of Supervisors* (1970) 7 Cal.App.3d 708, 714 [86 Cal.Rptr. 754] [rescission of zoning ordinance]), such action may not be taken when the issue involves revocation, a concept which, as we shall discuss, is germane to Steiner's and Stanton's cases.

We recognize some cases have held court intervention is permissible in some instances to force a local government to act. But in those cases, the actions were *administrative* rather than legislative. (See, e.g., *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 909, fn. 6 [141 Cal.Rptr. 133, 569 P.2d 727] [supervisors subject to contempt proceeding for failing to carry out court order relating to administrative action]; *Hicks* v. *Board of Supervisors, supra,* 69 Cal.App.3d at pp. 236-240 [plan to transfer investigative functions from district attorney to sheriff was administrative].)[19] And, none of the cases involved the use of punitive measures such as damages or removal from office, actions much more likely than mandate or injunctive or declaratory relief to cast a continuing chilling effect on the exercise of the office.

---

[18]The district attorney correctly notes county supervisors possess quasi-legislative, quasi-executive, and quasi-judicial powers, but that begs the question whether the separation of powers doctrine prevents undue interference with their quasi-legislative function. The district attorney suggests that because supervisors sometimes exercise a nonlegislative function, the separations of powers doctrine does not apply even when legislative powers are exercised. In making this suggestion, he is at odds with California Supreme Court authority, as we explain next.

[19]In *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184 [81 Cal.Rptr. 683], the court held mandate was available to compel the board of supervisors to supervise the county assessor. (*Id.* at p. 196.) The separation of powers issue was apparently not raised, as the court never addressed it. The court simply held mandamus lies to compel performance of a mandatory duty. (*Ibid.*) Because the separation of powers issue was not considered, *Knoff* does not impact our analysis. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496] [cases are not authority for propositions not considered].)

Such punitive measures must be given more careful scrutiny under the separation of powers doctrine.[20]

In any event, we must determine the nature of Steiner's and Stanton's alleged actions and inactions. As noted, the accusations' allegations involve treasurer Citron's investment activities which devastated county finances. Because the accusations allege Steiner and Stanton failed to obtain reports under section 53607, we may infer they had delegated investment power to Citron under that section. (See *People* v. *Hale, supra*, 232 Cal.App.2d at p. 123 [use of the title "auditor-controller" in pleading allowed inference county adopted resolution creating that position].)[21] ▬ 
 Having delegated the power, the only way to remedy any imprudent or wrongful action by Citron would be to revoke his power. (§ 53607 ["[the treasurer] shall . . . assume full responsibility for [financial] transactions until . . . the delegation of authority is revoked"]; and see *Johnston* v. *Board of Supervisors* (1947) 31 Cal.2d 66, 71-74 [187 P.2d 686], disapproved on other grounds in *Bailey* v. *County of Los Angeles* (1956) 46 Cal.2d 132 [293 P.2d 449] [board of supervisors could not exercise power delegated to planning commission unless it first revoked the delegation].)[22]

---

[20]The district attorney correctly points out the California Constitution contains no provision like the "Speech or Debate Clause" of the federal Constitution. (U.S. Const., art I, § 6.) The California separation of powers provision, however, provides a sufficient ground to protect legislators from punitive action that unduly impinges on their function.

[21]Because this is so, we need not address Steiner's contention the trial court erred by failing to take judicial notice of the resolution delegating the power.

[22]At oral argument, we asked the parties to brief the issue whether section 27000 provides independent authority for the treasurer to manage county investments. The section reads: "The county treasurer shall receive and keep safely all money belonging to the county and all other money directed by law to be paid to him and apply and pay it out, rendering the account as required by law." Several reasons compel the conclusion the section does not provide independent investment authority.

On our own motion, we take judicial notice of various legislative documents dealing with section 27000 furnished by the Legislative Intent Service. (Evid. Code, §§ 452, subd. (c), 459; *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 218, fn. 9 [185 Cal.Rptr. 270, 649 P.2d 912]; *Grubb & Ellis Co.* v. *Bello* (1993) 19 Cal.App.4th 231, 240-241 [23 Cal.Rptr.2d 281].) The section was enacted in 1872 as section 4144 of the Political Code using substantially the same language. Amendments over the years changed the section numbering, but did not impact the language materially. Although the legislative history provides no enlightenment on the issue, sections that accompanied section 4144 suggest it did not contemplate investment power. Indeed, the ensuing sections describe a bookkeeper's tasks. (See, e.g., former Pol. Code §§ 4146 [must give receipt for payments], 4147 [must write "paid" on face of paid warrants], 4149 [must give notice of funds available to pay warrrants drawing interest], 4155 [must report on moneys received and paid and debts due].) None of the sections use the words "invest" or "investment" or suggest the Legislature contemplated the power to invest. (See *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224] [statutes should be construed in light of the statutory framework as a whole].)

Another reason to find section 27000 does not grant the treasurer investment powers is section 53607 itself. If the treasurer had investment powers under section 27000, section

Was the initial delegation of power legislative? Section 53607 provides a strong indication it was, referring to "[t]he authority of the *legislative body*." (Italics added.)[23] But merely designating the action of a local government as legislative, does not necessarily make it so. ■ As noted in *Cinevision Corp.* v. *City of Burbank, supra,* 745 F.2d at p. 580, "Although a local legislator may vote on an issue, that alone does not necessarily determine that he or she was acting in a legislative capacity. Rather, '[w]hether actions . . . are . . . an exercise of legislative power depends not on their form but upon "whether they contain matter which is properly to be regarded as legislative in its character and effect." ' "

When the legislative branch of the federal or a state government cedes power to an administrative agency or a local government, its action is legislative in nature. (See *Hicks* v. *Board of Supervisors, supra,* 69 Cal.App.3d at p. 242 [board of supervisors' powers arise solely from the constitution or legislature's statutory action].) By analogy, when a board of supervisors delegates its authority to handle county financial matters to the treasurer, the act is legislative, as is the revocation of that delegation.

"The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct." (*Yakus* v. *United States* (1944) 321 U.S. 414, 424 [88 L.Ed. 834, 848, 64 S.Ct. 660].) "The test is purely functional. [Citation.] . . . [C]ourts [must] examine the . . . pleadings and determine whether the

---

53607 would be superfluous. In interpreting statutes and statutory schemes, we presume the Legislature did not intend to engage in an idle act. (See *International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 932 [163 Cal.Rptr. 782, 609 P.2d 1] [courts should construe statutes so one does not effectively repeal the other].) We attempt to give effect to the statutes as written. (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 459 [279 Cal.Rptr. 834, 807 P.2d 1063] [courts avoid constructions rendering statutory provisions superfluous or unnecessary].) We assume section 53607 was enacted to give investment powers because they were not included in section 27000.

For the same reason, the enactment of section 27000.1 in 1995 (Stats. 1995, ch. 784, § 3) bolsters our conclusion. It provides in relevant part: "The board of supervisors may, by ordinance, delegate to the county treasurer the authority to invest . . . the funds of the county . . . pursuant to [section 53600 et seq.]. The county treasurer shall *thereafter* assume full responsibility for those transactions until the board . . . revokes its delegation of authority." (§ 27000.1, italics added.) The section, which specifically applies the delegation powers under section 53607 to county supervisors, would be superfluous if the power to invest already belonged to the treasurer.

[23]Section 50002 provides: " 'Legislative body' as used in this division, means board of supervisors in the case of a county or city and county . . . unless the context otherwise requires." (See also § 53000 ["As used in this chapter, 'legislative body' means the board of supervisors in the case of a county or a city and county . . . unless the context otherwise requires."].)

acts alleged 'resulted[ed] from the nature, and in the execution of' the official's legislative duties." (*Traweek* v. *City and County of San Francisco, supra*, 659 F.Supp. at p. 1030.)

■ Examining the Steiner and Stanton accusations, the activities were plainly legislative in nature. Budgetary functions are generally legislative. "The budgetary process entails a complex balancing of public needs in many and varied areas with the finite financial resources available for distribution among those demands. It involves interdependent political, social and economic judgments which cannot be left to individual officers acting in isolation; rather, it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available." (*County of Butte* v. *Superior Court* (1985) 176 Cal.App.3d 693, 699 [222 Cal.Rptr. 429]; see also *Scott* v. *Common Council* (1996) 44 Cal.App.4th 684, 692, 698 [52 Cal.Rptr.2d 161] [embracing the rule, but finding the legislative authority may not use the budget to prevent a government official from carrying out the office's duties]; *Taylor* v. *Buff* (1985) 172 Cal.App.3d 384, 390 [218 Cal.Rptr. 249] [governmental actions involving essentially political decisions are immune from liability, including budgetary and fiscal questions].)

Investment strategy is an integral part of the budgetary process.[24] Even if the decision to make certain individual investments might not be considered purely legislative,[25] the decision to vest another elected county official with the power and discretion to make all investments plainly is. It is "macro" in nature, constituting a major policy decision. For these reasons, delegating investment power to Citron under section 53607 was legislative. The decision to revoke that power would be legislative as well. (*Santa Barbara County Taxpayers Assn.* v. *Board of Supervisors, supra*, 209 Cal.App.3d at pp. 946-947.) Because revocation of the investment power was the only way to "supervise" Citron, and later Raabe, allegations of a failure to supervise are really allegations of a failure to revoke, in other words a failure to exercise legislative discretion.

The allegations concerning the failure to supervise and gain information from Lewis and Schneider are just another way of saying Steiner and Stanton failed to be well enough informed to properly legislate. Although, under certain circumstances, court intervention might be appropriate to force

---

[24]In plain terms, what the county can spend is a function of its income from taxes, fees, and earnings on investments.

[25]"The test [for whether an action is legislative] is not precise, and there is some inconsistency of approach between the published decisions." (*Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 509 [150 Cal.Rptr. 326].)

supervision by supervisors in their administrative capacity,[26] the failure to perform supervisory duties may not be invoked as a ground for intervention where it relates to gaining information regarding the legislative function. (*Traweek* v. *City and County of San Francisco, supra,* 659 F.Supp. at pp. 1030-1031.)

The district attorney attempts to distinguish the law on legislative immunity by asserting none of the cases involved commission of a crime. Even assuming a crime exception exists,[27] the type of "crime" he suggests is applicable is not apt for the exception. The district attorney claims the exception applies because section 3060 proceedings are criminal. True, they have been characterized as such, but they are not in the ordinary sense of the word. (*Boags* v. *Municipal Court* (1987) 197 Cal.App.3d 65, 69 [242 Cal.Rptr. 681]; *People* v. *Hawes, supra,* 129 Cal.App.3d at p. 939; *People* v. *Superior Court (Hanson), supra,* 110 Cal.App.3d at p. 400; but see Pen. Code, § 15 [defining crime, among other things, as an act or omission violating the provisions of a law that results in a loss of public office].)

To the extent section 3060 defines a crime, there are compelling reasons for exempting it from any crime exception to the legislative immunity rule. In *Boags* v. *Municipal Court, supra,* 197 Cal.App.3d 65, the district attorney invoked Penal Code former section 1222 to criminally charge a sitting judge with willfully failing to disqualify himself when it was required by law. (197 Cal.App.3d at pp. 67-68.) The section made " '[e]very willful omission to perform any duty enjoined by law upon any public officer' " a misdemeanor. (*Id.* at p. 68, fn. 2.) The court found that applying the section to a judicial officer violated the separation of powers doctrine. (*Ibid.*)

The court's reasoning is cogent and compelling: "Under Section 1222 as the prosecution asks us to construe this provision, the executive would be given discretion to commence a criminal action against a judge whenever it considered he had failed to properly perform his judicial duties. Hence the executive would be able to charge a judge with a misdemeanor merely for the erroneous exercise of the judicial powers vested in him by the Constitution. The doctrine of separation of powers demands that the branches of

---

[26]"Supervision" is limited, however. Although a board may have the power to supervise under section 25303, "[it] has no power to perform county officers' statutory duties for them or direct the manner in which duties are performed. [Citation.]" (*Hicks* v. *Board of Supervisors, supra,* 69 Cal.App.3d at p. 242.) And, as noted, there is a constitutionally cognizable difference between court intervention using mandate and similar remedies to force action, and such intervention using punitive measures.

[27]We say "assuming" because we have been unable to find a California case stating that proposition. But well-established federal law supports the exception. (See *Traweek* v. *City and County of San Francisco, supra,* 659 F.Supp. at p. 1030.) And, the district attorney points out the absence of such an exception would allow legislators to engage in bribery and other crimes with impunity on the cloak of immunity.

government be coequal. The judicial power therefore must be independent, and that power is compromised when an individual judge wishes to perform his functions but must first consider the possibility the prosecutor may disapprove and charge him criminally. Section 1222 construed as the prosecution asks would make the performance of the manifold judicial duties and functions a very risky business. For example, should the executive have the option of prosecuting a judge criminally if he failed to maintain order and decorum in proceedings before him or demonstrated impatience with a lawyer or a witness [citation]? If he failed to comply with the requirement in Penal Code section 987.9 that application for funds for the preparation or presentation of the defense of a capital case be kept confidential [citation]? If he communicated with a judge of the reviewing court concerning the facts of a case on appeal [citation]? If he failed to decide cases within 90 days of their submission [citations]? If he failed to render a timely decision to impose consecutive sentences [citations]? If he failed to impose a prison term made mandatory by the Penal Code [citation]? If he failed to give a proper instruction to the jury [citations]? If after imposing sentence he failed to advise a defendant not represented by counsel of the right to appeal [citation]? If he failed to conduct a hearing on a petition for order permitting abortion without parental consent within three days after the date of filing [citations]? We submit the answer to the foregoing questions is self-evident and demonstrates the constitutional infirmity of Section 1222. To allow Section 1222 to be used in this manner would place the entire judiciary at the mercy of the executive." (*Boags* v. *Municipal Court*, *supra*, 197 Cal.App.3d at pp. 69-70.)[28]

Similarly, if we held section 3060 falls within the crime exception to legislative immunity because it makes criminal the failure of supervisors to adequately carry out their general duties, it would put the district attorney in the position of a super-governor in the county. Supervisors would look over their shoulders before taking any discretionary action for fear the district attorney would find they had not passed muster and would subject them to the expensive and protracted proceedings we have seen in this case. On the other hand, if the supervisors failed to act, they would fear "criminal" prosecution for a negligent omission. They would be hard pressed to function adequately in such an environment.

We stress our holding is narrow. We find section 3060 violates the separation of powers provision of the California Constitution insofar as it is

---

[28]See also *Lake Country Estates* v. *Tahoe Planning Agcy.*, *supra*, 440 U.S. at page 405 [59 L.Ed.2d at p. 412]: " '[Legislative immunity] would be of little value if [legislators] could be subjected to the cost and inconvenience of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives.' "

used to accuse county supervisors for acts or omissions committed as a part of their legislative functions and which violate no penal statute.[29] Because that is what happened here, the objections should have been sustained.[30]

Let peremptory writs of mandate issue directing the trial court to vacate its orders overruling Steiner's and Stanton's objections to their accusations in case Nos. 95ZF0060 and 95ZF0061, and to enter orders granting the objections and dismissing the accusations. The alternative writs are discharged and the stays are dissolved.

Crosby, Acting P. J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied December 13, 1996, and the petition of real party in interest for review by the Supreme Court was denied March 19, 1997.

---

[29]This conclusion would apply with even more force if the district attorney were correct in asserting a section 3060 violation requires no more than conscious action or inaction. Nonetheless, it applies to cases of knowing nonfeasance when the prosecuting agency seeks to invoke the statute as to legislative inaction.

[30]The district attorney notes no cases have found section 3060 violates the separation of powers doctrine. We assume that is because the issue has never been raised before. We found no case where a district attorney attempted to oust elected officials for handling legislative matters in an allegedly poor fashion.

We do not believe this ruling will cause local governments to engage in thoughtless or capricious acts or omissions. The electorate has the recall process available, one which was used successfully in this county in the last year. In a recall election, more than 12 people are required to vote out those who were duly elected to use their best judgment in governing. To the possible rejoinder that recall elections are time consuming and expensive, we hold out the protracted proceedings in Steiner's and Stanton's cases as Exhibits A and B and ask the question, "Compared to what?"