[No. G037836. Fourth Dist., Div. Three. Oct. 21, 2008.]

ROBERT D'AMATO, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Ronald G. Brower and Mark W. Fredrick for Petitioner.

No appearance for Respondent.

Tony Rackauckas, District Attorney, and Brian N. Gurwitz, Deputy District Attorney, for Real Party in Interest.

OPINION

**ARONSON, Acting P. J.**—Petitioner Robert D'Amato was the City Administrator of the City of Placentia and supervised codefendant Christopher Becker, the city's director of public works. To obtain federal funding for a project to lower the rail grades at street crossings, petitioner recommended the city council form a joint powers authority (JPA). As a board member of the newly formed JPA, petitioner voted with other JPA board members to contract with Becker's consulting firm to serve as project manager. Because Becker served as both Placentia's public works director and as the JPA project manager, a grand jury indicted him for having a personal interest in a contract he made while acting in his official capacity in violation of Government Code section 1090,[1] and indicted petitioner for aiding and abetting Becker. After the trial court denied petitioner's motion to set aside the indictment, petitioner sought a writ of prohibition barring the district attorney from prosecuting the criminal action against him. Petitioner contends, inter alia, the action is barred by the separation of powers doctrine and that insufficient evidence supports the indictment.

---

[1] All statutory references are to the Government Code unless otherwise noted.

■ We conclude a substantial portion of the indictment's allegations challenge acts petitioner undertook in support of legislative activity. Because the Legislature did not intend to criminalize legislative acts taken by public officials who hold no personal financial interest in a contract made in violation of section 1090, petitioner's legislative activity may not serve as a basis for the indictment. We also conclude the remainder of the indictment's allegations lack the requisite supporting evidence. Accordingly, we grant the writ petition.

I

### FACTUAL AND PROCEDURAL BACKGROUND

In 1995, the City of Placentia began exploring the feasibility of lowering railroad crossings in its boundaries to address safety issues and improve traffic flow. After receiving a favorable opinion from its outside consultant on the project's feasibility, the city council, on April 4, 2000, formed a JPA known as the Orange North-American Trade Rail Access Corridor (ONTRAC). Petitioner served as one of three ONTRAC board members.

Four months before the city formed ONTRAC, Becker took steps to become ONTRAC's executive director, which included incorporating a consulting firm named Chris Becker and Associates (Becker and Associates). The city's outside consultant, the city council, petitioner, and the other ONTRAC board members encouraged Becker to apply for the executive director position. On April 25, 2000, petitioner and the two other ONTRAC board members voted to retain Becker and Associates and thereby secure Becker's services as ONTRAC's executive director. Under the agreement, ONTRAC agreed to pay Becker and Associates a retainer fee of $200 per hour for Becker's time, and a contingency fee upon completion of the project equaling 1.5 percent of the estimated total cost of $300 million, i.e., $4.5 million, less the retainer fee paid. Becker would retain his position as director of public works, and continue to receive his salary and benefits. To avoid what might be viewed as "double-dipping," Becker and Associates agreed to repay Placentia all of Becker's salary and benefits he would receive as director of public works during the time he served as ONTRAC's executive director. Becker continued in his dual role until 2004, when he resigned his position as director of public works. Later in 2004, petitioner retired. Becker was removed as ONTRAC's executive director in November 2005.

On March 27, 2006, the grand jury indicted Becker for violating section 1090, and indicted petitioner on two counts of aiding and abetting Becker. Count 1 of petitioner's indictment concerns his role in forming the ONTRAC joint powers agreement, and count 2 centers on the professional services

contract between ONTRAC and Becker and Associates. The trial court denied petitioner's motion to set aside the indictment, and petitioner now seeks a writ of prohibition.

## II

### DISCUSSION

A. *The Separation of Powers Doctrine Bars Criminal Prosecution of a Public Official for Aiding and Abetting a Violation of Section 1090 Where the Official Lacks a Personal Financial Interest and the Prosecution Is Based on the Official's Legislative Acts*

 1. *Application of Aider and Abettor Liability to Local Legislative Activity Requires an Impermissible Inquiry into the Legislators' Motives*

Section 1090 provides in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." Section 1097 provides: "Every officer or person prohibited by the laws of this state from making or being interested in contracts, or from becoming a vendor or purchaser at sales, or from purchasing script, or other evidences of indebtedness, including any member of the governing board of a school district, who willfully violates any of the provisions of such laws, is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

■ Section 1090, like all conflict of interest statutes, is based on "[t]he truism that a person cannot serve two masters simultaneously . . . ." (*Thomson v. Call* (1985) 38 Cal.3d 633, 637 [214 Cal.Rptr. 139, 699 P.2d 316].) "The object of section 1090 of prohibiting individuals 'from being financially interested in any contract made by them in their official capacity or by the body or board of which they are members is to insure absolute loyalty and undivided allegiance to the best interest of the [government agency] they serve and to remove all direct and indirect influence of an interested officer as well as to discourage deliberate dishonesty. [Citations.]' [Citation.]" (*Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 659 [99 Cal.Rptr.2d 897].) "The evil to be thwarted by section 1090 is easily identified: If a public official is pulled in one direction by his financial interest and in another direction by his official duties, his judgment cannot and should not be trusted, even if he attempts impartiality." (*Carson Redevelopment Agency v. Padilla* (2006) 140 Cal.App.4th 1323, 1330

[44 Cal.Rptr.3d 881].) Thus, where a public official holds a personal interest, criminal liability may accrue even in the absence of "actual fraud, dishonesty, unfairness or loss to the governmental entity, and . . . without regard to whether the contract in question is fair or oppressive." (*People v. Honig* (1996) 48 Cal.App.4th 289, 314 [55 Cal.Rptr.2d 555] (*Honig*).) Simply put, the official is subject to criminal liability under section 1097 if the official knows that he or she might profit from the contract. (*Honig*, at pp. 334–336.) It is not a defense that the official acted in good faith, sincerely believed the contract was in the public's best interest, or acted under the advice of counsel. (See *People v. Chacon* (2007) 40 Cal.4th 558 [53 Cal.Rptr.3d 876, 150 P.3d 755] (*Chacon*).)

By creating a conclusive presumption of divided loyalty where a public official holds a personal financial interest, the Legislature avoided the prospect of executive and judicial officers delving into the subjective motivations of public officials performing their legislative duties. This respect for the deliberative processes of local governmental agencies derives from the separation of powers doctrine, embodied in the California Constitution, article III, section 3: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

True, article III, section 3 of the California Constitution, does not by its express terms apply to local government agencies. Accordingly, "in establishing a governmental structure for the purpose of managing municipal affairs, the Legislature (through statutes) or local entities (through charter provisions and the like) may combine executive, legislative, and judicial functions in a manner different from the structure that the California Constitution prescribes for state government." (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1093, fn. 23 [17 Cal.Rptr.3d 225, 95 P.3d 459] (*Lockyer*).) But the separation of powers principle embodied in the Constitution nonetheless prevents a county or municipal government department from exercising powers not conferred upon it by the Legislature. (*Ibid.*; *Wulzen v. Board of Supervisors* (1894) 101 Cal. 15, 25–26 [35 P. 353].) When the Legislature confers legislative power on a municipal body, a judicial or executive body may not interfere with that legislative power, except as the Legislature authorizes. (See *Nickerson v. County of San Bernardino* (1918) 179 Cal. 518, 522 [177 P. 465] [proscribing judicial interference with legislative acts of municipal legislative body].)

"An . . . important corollary of the separation of powers doctrine is courts cannot inquire into the impetus or motive behind legislative action." (*Steiner v. Superior Court* (1996) 50 Cal.App.4th 1771, 1783 [58 Cal.Rptr.2d

668] (*Steiner*).) "[T]he rule barring judicial probing of lawmakers' motivations applies to local legislators as well as to members of the state Legislature or of Congress." (*County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 726 [119 Cal.Rptr. 631, 532 P.2d 495].) *Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616 [38 Cal.Rptr.2d 876], illustrates this principle. There, the court considered whether a judges' association could invoke discovery procedures to determine if the county board of supervisors complied with a statute requiring them to " 'take into advisement the recommendation of the judges,' " before voting on a proposal to remove court security services from the marshal's office, and consolidate the services with the county sheriff. (*Id.* at p. 1619.) Reversing the trial court's order allowing the discovery, the appellate court ruled that the separation of powers doctrine precluded judicially authorized inquiry into the subjective motives or mental processes of legislators. The court determined the doctrine not only barred questioning of the individual supervisors, but also precluded the deposition of others, including the county sheriff, on facts which may have influenced the supervisors' votes. (*Id.* at p. 1627.)

■ Assessing criminal liability against a public official for aiding and abetting a violation of section 1090 necessarily requires inquiry into the public official's subjective motivations when the prosecution is based on the official's legislative acts. Specifically, Penal Code section 31 provides: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." To be criminally liable, an aider and abettor must "act with knowledge of the criminal purpose of the perpetrator *and with an intent or purpose* either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318], some italics added.) Thus, to obtain a conviction under an aider and abettor theory, it is not sufficient to demonstrate merely that the defendant assisted the perpetrator with knowledge of the perpetrator's unlawful purpose; the prosecutor also must prove the defendant's " '*fundamental purpose, motive and intent* [was] to aid and assist the perpetrator in the latter's commission of the crime.' " (*Id.* at p. 556, italics added.)

The problem here is illustrated, for example, in count 1 of the indictment, concerning petitioner's role in forming the ONTRAC JPA. Although formation of the JPA was a necessary step in Becker's alleged section 1090 violation, formation was also a necessary step in the city's proposed rail-lowering project, even if Becker had not been designated its executive director. Thus, in ascertaining aiding and abetting culpability as to count 1, the trier of fact would have to determine whether petitioner assisted in forming the JPA with the purpose and intent of helping Becker violate section

1090, or whether petitioner did so simply to facilitate the rail-lowering project. This inquiry directly contravenes the separation of powers principles discussed above.

### 2. The Legislature Did Not Intend to Abrogate Legislative Immunity Where the Legislator Does Not Hold a Personal Financial Interest

Another "corollary of the separation of powers doctrine as it impacts legislatures is legislators have absolute immunity from damage suits based on legislative acts." (*Steiner, supra,* 50 Cal.App.4th at p. 1784.) In *Steiner,* we considered whether legislative immunity precluded an action by the district attorney to unseat two county supervisors for "willful or corrupt misconduct in office" under section 3060 based on their failure to adequately supervise the county treasurer, who made speculative investments resulting in the county's bankruptcy. In addition to determining the evidence failed to support an action under section 3060, we concluded the separation of powers doctrine also barred the district attorney from proceeding. After considering the background and purposes underlying legislative immunity, we declined to limit the doctrine to civil damage cases, and articulated the general rule that "legal action may not be taken against supervisors for their activities involving planning or enacting legislation." (*Steiner,* at p. 1785.) Specifically, we recognized the supervisors' delegation of investment authority to the treasurer constituted a legislative act, and the only way the supervisors could have monitored the treasurer was to revoke that authority through another legislative act. (*Id.* at p. 1788.) We therefore concluded the action violated the separation of powers doctrine because the prosecution based its case on the supervisors' failure to pass a law revoking earlier legislation. (*Ibid.*)

The district attorney acknowledges the principles of legislative immunity as articulated in *Steiner,* but contends immunity applies only to civil suits, and does not extend to criminal prosecutions. We disagree.

True, we recognized in *Steiner* that an exception to legislative immunity may arise when a local agency's legislative actions violate a specific criminal statute. But we also recognized that "[t]he California separation of powers provision . . . provides a sufficient ground to protect legislators from punitive action that unduly impinges on their function." (*Steiner, supra,* 50 Cal.App.4th at p. 1786, fn. 20.) The level of intimidation against a local legislator arising from the threat of a criminal proceeding is at least as great as the threat from a civil suit. Accordingly, we concluded in *Steiner* that even if section 3060 were considered a criminal statute, it still would violate the separation of powers doctrine because the statute's broad proscriptions against willful or corrupt misconduct in office "would put the district attorney in the position of a super-governor in the county," causing supervisors to "look over their

shoulders before taking any discretionary action for fear the district attorney would find they had not passed muster . . . ." (*Id.* at p. 1790.)

The protection against criminal prosecution afforded by the separation of powers doctrine was recognized in *Boags v. Municipal Court* (1987) 197 Cal.App.3d 65 [242 Cal.Rptr. 681] (*Boags*). There, the prosecution criminally charged a judge with a violation of section 1222, which provides: "Every willful omission to perform any duty enjoined by law upon any public officer, or person holding any public trust or employment, where no special provision is made for the punishment of such delinquency, is punishable as a misdemeanor." The misdemeanor complaint alleged the judge violated section 1222 by failing to recuse himself from hearing a matter when he was legally required to do so. The court in *Boags* concluded section 1222 violated the separation of powers doctrine when applied to judicial activities because the statute granted the executive branch discretion to criminally charge a judge whenever it considered the judge's actions improper. (197 Cal.App.3d at p. 69.) The court reasoned: "The doctrine of separation of powers demands that the branches of government be coequal. The judicial power therefore must be independent, and that power is compromised when an individual judge wishes to perform his functions but must first consider the possibility the prosecutor may disapprove and charge him criminally. Section 1222 construed as the [district attorney] asks would make the performance of the manifold judicial duties and functions a very risky business." (*Id.* at pp. 69–70.)

■ Thus, *Steiner* and *Boags* stand for the proposition that the separation of powers doctrine prohibits prosecutors from using a generally applicable criminal statute to oversee legislators or judges in the performance of their legislative or judicial duties, and thereby impinge on their ability to function independently. This is not to say that the Legislature is prohibited from criminalizing specific legislative acts of a municipal legislative body. (See *Lockyer, supra*, 33 Cal.4th at p. 1094, fn. 23.) But the "common-law principles of legislative and judicial immunity . . . should not be abrogated absent clear legislative intent to do so." (*Pulliam v. Allen* (1984) 466 U.S. 522, 529 [80 L.Ed.2d 565, 104 S.Ct. 1970].) The issue here, therefore, is whether in enacting section 1090 the Legislature clearly intended to empower the executive to challenge legislative acts and, if so, whether the Legislature provided some limits on this authority.

■ "We of course begin our efforts to determine the intent of the Legislature with an examination of the words of the statute." (*People v. Anderson* (1990) 221 Cal.App.3d 331, 340 [270 Cal.Rptr. 516].) Section 1090 provides, in relevant part: "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially

interested in any contract made by them in their official capacity, or by any body or board of which they are members." ■ Although the making of a public contract, typically a legislative act, is a required element in a section 1090 violation, the statute is worded to focus its proscription on the *holding of a financial interest in the contract* rather than the *making of the contract*. Thus, an official may violate section 1090 by voting in favor of a contract in which he or she holds an interest, but may also incur liability even if the official abstains from voting or resigns from the deliberative body before the vote on the contract is taken. (*Honig, supra*, 48 Cal.App.4th at pp. 314–315.) Had the Legislature intended to focus its proscription on the making of the contract, it could have worded section 1090 as follows: "Members of the Legislature, state, county, district, judicial district, and city officers or employees, or any body or board of which they are members, shall not make any contract in which they are financially interested." The language the Legislature selected discloses an intent to limit executive interference with legislative acts by focusing its prohibition on officials having a financial interest in the contract.

■ Moreover, the Legislature's wording of section 1090 evinces the intent to exclude aider and abettor liability. Specifically, "where the Legislature has dealt with crimes which necessarily involve the joint action of two or more persons, and where no punishment at all is provided for the conduct, or misconduct, of one of the participants, the party whose participation is not denounced by statute cannot be charged with criminal conduct on either a conspiracy or aiding and abetting theory. [Citation.] So, although generally a defendant may be liable to prosecution for conspiracy as an aider and abettor to commit a crime even though he or she is incapable of committing the crime itself, the rule does not apply where the statute defining the substantive offense discloses an affirmative legislative policy the conduct of one of the parties shall go unpunished. [Citation.]" (*In re Meagan R.* (1996) 42 Cal.App.4th 17, 24 [49 Cal.Rptr.2d 325].) ■ Section 1090 proscribes an official's financial interest in (a) a contract made by the official, or (b) a contract made by a body or board of which the official is a member. True, an official who is empowered to execute contracts without the concurrence of a body or board may violate the first clause of section 1090 without involving other people. But an interested official cannot violate the second clause of the statute without the concurrence of other officials. Again, the Legislature could have worded this portion of section 1090 to expressly proscribe officials serving on a body or board from approving a contract in which one of their members has an interest. Instead, the Legislature narrowed the scope of liability to apply only to officials having an interest in a contract approved by the body or board. ■ Thus, the language of section 1090 is consistent with a legislative intent to exclude from punishment members of a legislative body who do not have a financial interest in the contract at issue.

■■■ " 'To the extent that uncertainty remains in interpreting statutory language, "consideration should be given to the consequences that will flow from a particular interpretation" [citation] . . . . [Citation.]' " (*People v. Frawley* (2000) 82 Cal.App.4th 784, 789 [98 Cal.Rptr.2d 555].) Interpreting section 1090 to allow aider and abettor liability could have dire consequences affecting the ability of a local legislative body to operate in an independent manner. Liability accrues under section 1090 not only from making or voting in favor of a contract, but also from "the planning, preliminary discussion, compromises, drawing of plans and specifications and solicitation of bids" leading up to the making of a contract. (*Honig, supra*, 48 Cal.App.4th at p. 315.) Typically these matters are not handled by a single official or employee, but involve many government employees, including the city attorney who drafts the contract, the city manager who makes a recommendation, and members of the deliberative body who vote on the contract. Given the broad reach of criminal and civil liability under sections 1090 and 1097, applying aider and abettor liability to the financially interested official's fellow public servants would turn a powerful tool against financial conflicts of interest into a dangerous weapon enabling a prosecutor to seek removal of an entire legislative body, both duly elected officials and staff members, based on a single official's financial interest. Equally troubling, a prosecutor could influence a public agency's future legislative path by picking and choosing which officials and staff members to prosecute, and which to leave alone.

The scenario in *Chacon, supra*, 40 Cal.4th 558, illustrates the point. There, the defendant, a member of the Bell Gardens City Council, sought appointment as city manager. Because an existing city ordinance rendered council members ineligible for appointment for one year following departure from the city council, she enlisted the city attorney's assistance to draft an ordinance eliminating the waiting period, and persuaded a fellow council member to place the proposed ordinance on the agenda. After the council unanimously passed the ordinance eliminating the waiting period, with the defendant abstaining, the council unanimously voted to appoint the defendant city manager. The Supreme Court held that the defendant could not rely on advice of counsel as a defense to a section 1090 violation. (*Chacon*, at p. 570.)

Given the *Chacon* city council's indisputable knowledge of the defendant's financial interest, and the city attorney's active assistance and encouragement, the city attorney and the entire city council could have been charged with aiding and abetting the defendant's section 1090 violation and, if convicted, could have been barred forever from holding political office under section 1097. Nothing, however, suggests the Legislature intended to vest prosecutors with the power to disrupt the entire legislative body based on one member's financial interest.

■ Here, the district attorney concedes petitioner never had any personal financial interest in either the ONTRAC joint powers agreement or the professional services contract between ONTRAC and Becker and Associates. Moreover, the evidence demonstrates petitioner was only one of several city officials who voted to approve the Becker and Associates contract and provide assistance in bringing the agreement to fruition. Yet the district attorney singled out petitioner as an aider and abettor. When questioned during oral argument why petitioner alone was targeted for aider and abettor prosecution, the district attorney emphasized petitioner's friendship with Becker. Although friendship may compromise a public official's loyalties, the Legislature focused section 1090 on only the divided loyalties caused by a personal financial interest. (See *BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1230 [97 Cal.Rptr.2d 467] ["The purpose of . . . section [1090] is to prohibit self-dealing, not representation of the interests of others."].)

The district attorney contends precluding aider and abettor liability under section 1090 for legislative acts performed by an official having no financial interest would amount to "a shocking grant of immunity" that would "hamper the legislative branch's strong interest in maintaining and regulating the honesty of legislators." We disagree.

The district attorney argues our view of section 1090 would have precluded criminal prosecution or civil liability in the following eight reported cases: *Chacon, supra*, 40 Cal.4th 558; *Stigall v. City of Taft* (1962) 58 Cal.2d 565 [25 Cal.Rptr. 441, 375 P.2d 289]; *Finnegan v. Schrader* (2001) 91 Cal.App.4th 572 [110 Cal.Rptr.2d 552]; *Honig, supra*, 48 Cal.App.4th 289; *People v. Vallerga* (1977) 67 Cal.App.3d 847 [136 Cal.Rptr. 429]; *People v. Sobel* (1974) 40 Cal.App.3d 1046 [115 Cal.Rptr. 532]; *People v. Watson* (1971) 15 Cal.App.3d 28 [92 Cal.Rptr. 860]; *People ex rel. State of Cal. v. Drinkhouse* (1970) 4 Cal.App.3d 931 [84 Cal.Rptr. 773] (*Drinkhouse*). Our holding, however, would not have affected any of these decisions. Of the eight cases cited, only *Drinkhouse* concerned aider and abettor liability. There, a public official aided and abetted a tax collector's section 1090 violation by buying tax-defaulted properties. The principles discussed above would not have affected the aider and abettor conviction in *Drinkhouse* because (a) the official was personally interested in the transactions, and (b) purchasing real property for one's own benefit is not a legislative activity. Indeed, we have been unable to discover a single published case in which our holding would have changed the outcome.[2]

---

[2] A review of Shepard's Citations reveals 423 published cases citing section 1090. None involve the prosecution of a public official, holding no financial interest, for aiding and abetting another's section 1090 violation. One case, however, states that all members of a public body or board violate section 1090 by voting in favor of a contract in which they know

■ In sum, we conclude the Legislature intended section 1090's "financial interest" element as a limitation on a prosecutor's intrusion into the legislative arena. Accordingly, we hold that the separation of powers doctrine bars criminal prosecution of a public official for aiding and abetting another's section 1090 violation based on that official's legislative activities where the official does not hold a personal financial interest in the contract at issue.[3]

## B. *Petitioner's Indictment Is Largely Based on Legislative Activity*

The district attorney contends none of the alleged acts underlying petitioner's indictment qualify for legislative immunity. We disagree.

■ For purposes of legislative immunity, protected legislative activity includes those "activities involving planning or enacting legislation." (*Steiner, supra*, 50 Cal.App.4th at p. 1785.) It also includes activities related to the revocation of existing legislation. (*Ibid.*) Moreover, the principle of legislative immunity " 'protects not only the conduct of municipal legislators, but also the acts of municipal administrators and executives "taken in direct assistance of legislative activity." [Citation.]' [Citations.]" (*Id.* at pp. 1784–1785.)

At our request, the district attorney submitted a letter brief outlining petitioner's specific acts and omissions demonstrating potential criminal liability, and the supporting evidence presented to the grand jury.[4] These include the following claims:

### 1. *Petitioner Recommended the City Council Approve the Contract Forming the ONTRAC JPA*

The district attorney asserts petitioner "was instrumental in recommending that the city council approve the contract that formed the ONTRAC JPA." The district attorney relies on testimony that the recommendation to form a joint powers agreement "would have come through [petitioner] and Chris Becker." Undisputed evidence before the grand jury, however, established that formation of a JPA was required to obtain the state and federal

---

a member has a financial interest. (*People v. Darby* (1952) 114 Cal.App.2d 412, 427 [250 P.2d 743].) Because the defendant in *Darby* was financially interested in the contract made, the appellate court's statement regarding the potential liability of others was dictum. The *Darby* court cited no authority for its statement and did not analyze the separation of powers issues we address here. To the extent *Darby*'s dictum is inconsistent with our holding, we respectfully disagree with it.

[3] Implicit in our holding is that petitioner could be held liable under section 1090 if evidence demonstrated he had received kickbacks or other financial incentives from Becker, regardless of whether petitioner's aiding and abetting activities were legislative.

[4] We requested briefing on the following issue: "What acts and specific evidence would support a finding that petitioner aided and abetted the crime alleged to have been committed by Becker?"

grants needed to implement the rail-lowering project. Recommending JPA formation fell squarely within petitioner's normal duties as city administrator to make recommendations to the city council and was " ' "taken in direct assistance of legislative activity." [Citation.]' " (*Steiner, supra,* 50 Cal.App.4th at pp. 1784–1785.)

2. *As a Member of ONTRAC's Board, Petitioner Voted in Favor of Retaining Becker and Associates*

The district attorney notes that petitioner, along with the other two ONTRAC board members, voted for the Becker and Associates contract. This is indisputably legislative activity.

3. *Petitioner Recommended Becker as ONTRAC's Executive Director*

The district attorney states "petitioner was Becker's advocate, encouraging Becker to become Executive Director of ONTRAC and encouraging others to approve the 'selection of Chris Becker and the financial arrangement' that was set out in his contract." In the cited portions of the grand jury testimony, witnesses quoted petitioner as saying the contract was a good deal for the city, and the city should keep Becker as public works director and, "get this great executive director for a very important project . . . ." Petitioner also touted Becker's dual role as a way to save money.

As for encouraging Becker, the district attorney cites George McFarlin's testimony that several people, including petitioner, wanted Becker appointed executive director. The primary person advising Becker, a consultant named Cliff Lampman, had the most experience with this particular type of project, and spent more time than anyone else working with Becker. McFarlin further stated: "I believe [petitioner] also encouraged [Becker], and I would say that the board members of ONTRAC and the city council members also encouraged him. He was very highly thought of at the city during his tenure as public works director." Another witness, Norman Eckenrode, testified that he "believed" that petitioner encouraged Becker to assume dual roles.

The city council's discretionary selection of the ONTRAC executive director constitutes legislative activity. The cited evidence demonstrates that petitioner was acting "in direct assistance of legislative activity" by recommending Becker's appointment. (See *Steiner, supra,* 50 Cal.App.4th at pp. 1784–1785.)

4. *Petitioner Minimized the Real Cost of ONTRAC in the Budget Reports and Communications with the Council Members*

The district attorney asserts: "The evidence also shows that petitioner intentionally minimized the real cost of ONTRAC in his budget reports and

communications with the council members." In response to our request for further briefing on this issue, the district attorney cited the following incidents to support the aiding and abetting theory.

Scott Brady, the city's mayor, testified he repeatedly asked petitioner at city council and ONTRAC meetings whether ONTRAC was being funded from the city's general fund. Petitioner reportedly stated: "This will not cost the city any money. ONTRAC ultimately would not cost the city any money." Brady testified he believed petitioner's statements were not true, explaining: "What [petitioner] meant to say without being terribly clear a lot [of the] time[] was that if the city received federal funding the federal government has the obligation to reimburse money spent for the project, but the project you actually billed. So if we had received 225 million and if the state had given us matching moneys, then the money we spent to do all the drawings and all the architectural drawings which amounted to almost six million dollars could be reimbursed by those funds. [¶] Of course that didn't happen and so the money we spent for that will not be reimbursed. [¶] I think that's what he meant when he made that reference."

Brady also testified that he asked petitioner at a public council meeting whether "we [are] currently using any city funds" to pay the ONTRAC contract. Petitioner replied that "no city funds are being used to fund ONTRAC." Brady continued: "I asked [petitioner] later what he meant. He said what I meant is once we get the money from the state and the feds then of course we'll get reimbursed all these funds so we're really not using any city funds. . . ."

Constance Underhill, a councilwoman and former mayor, testified she questioned petitioner about the city's budget problems, and that he placed the blame for the problems on the elimination of vehicle license fees and other state funding sources. When asked if petitioner said anything else, Underhill testified: "I think at that point instead of volunteering a lot, he was waiting. If we didn't ask, we weren't going to be told anything."

Finally, Raymond Griest, interim city administrator who succeeded petitioner upon his retirement, reviewed a copy of the city budget and noticed an "inordinately high number of negative balances in particular line item accounts . . . ." After investigation and analysis, Griest concluded that payments to ONTRAC from the city's general fund contributed to the city's deficit. He later calculated that the amount of the city's deficit attributable to ONTRAC was $12 million. Among other things, Griest noted that the budget reflected income not received during the budget's fiscal year.

■ As we recognized in *Steiner*, budgetary decisions are generally legislative acts requiring the legislative body to weigh political, social, and economic factors. (*Steiner, supra,* 50 Cal.App.4th at p. 1788.) Although petitioner adopted overly optimistic projections of potential government reimbursements for the city's ONTRAC expenditures, the evidence does not demonstrate petitioner stepped outside his customary role in the city council's budgetary process. That the district attorney believes petitioner should have been more conservative in expressing his views and in drafting budget documents does not change the essentially legislative nature of petitioner's acts.

### 5. *Allowing Becker to Remain in His Dual Role*

The district attorney states: "[A]fter Becker resigned, petitioner subsequently admitted that he allowed him to continue for too long in his dual role as city employee and Executive Director of ONTRAC." The cited portions of the grand jury transcript contain the testimony of two witnesses who stated petitioner told them he had allowed Becker to remain in dual roles as director of public works and ONTRAC's executive director to "go on too long," and that he should have either removed Becker as director of public works or eliminated his salary.

As an initial matter, we note that petitioner's statements of regret are not criminal acts and do not, standing alone, subject him to criminal liability. As to his failure to terminate Becker, the nature of petitioner's decision to keep Becker as executive director is indistinguishable from the decision to hire him in the first place. Both decisions are inherently legislative.

### C. *The Indictment's Allegations Regarding Petitioner's Interactions with the City Attorney Lack Supporting Evidence*

The district attorney cites the following allegations regarding petitioner's interactions with the city attorney to support an aiding and abetting theory: Petitioner attempted to dissuade the city attorney from seeking a legal opinion on the legality of Becker serving dual roles; he failed to inform the city council of the city attorney's concerns regarding a possible conflict of interest; and he disagreed with a new city attorney's assessment a conflict of interest existed. Although these acts may fall within the scope of legislative activities, the indictment's allegations independently fail because they are not supported by sufficient evidence.

■ Under " 'section 995 of the Penal Code, an information, and . . . an indictment, "must be set aside by the court [if the defendant] has been

indicted without reasonable or probable cause" or "committed without probable cause." . . . "Section 872 of the Penal Code provides that the defendant must be held to answer if 'it appears from the examination that a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof.' " ' [Citations.] [¶] . . . ' " 'Evidence that will justify a prosecution need not be sufficient to support a conviction. . . . An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.]' " ' " (*Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1026–1027 [13 Cal.Rptr.2d 551, 839 P.2d 1059] (*Cummiskey*).) In determining whether the evidence is sufficient to support the indictment, we consider each of the allegations and supporting evidence in turn.

1. *Discouraging the City Attorney from Requesting a Conflicts Opinion Letter*

The district attorney states: "[W]hen City Attorney Carol Tanenbaum became concerned that Becker's contract might pose an unlawful conflict of interest, and violate . . . section 1090, petitioner tried to discourage her from sending a written request to ONTRAC's legal counsel to obtain a formal opinion on the conflict issue. Petitioner insisted that no conflict existed."

In June 2000, City Attorney Carol Tanenbaum questioned whether the agreement between ONTRAC and Becker and Associates created a conflict of interest for Becker. She wrote a memorandum to the attorneys who drafted the agreement, and requested an opinion letter on whether the agreement created an illegal conflict of interest. Before sending the memorandum, Tanenbaum met with petitioner to inform him of her request for the opinion letter.

According to the grand jury testimony cited by the district attorney, Tanenbaum told petitioner: "Bob, I'm concerned about this issue with the employment of a city employee[']s corporation being hired by ONTRAC. And it may not be a problem, but it may be a problem and so I'm not even giving this to you, but I am reading it to you." Petitioner assured Tanenbaum there was no need to send the memo because no problem existed. Petitioner, however, did not tell Tanenbaum not to send the memo.

Tanenbaum explained she felt uncomfortable after her conversation with petitioner because "it was clear to me he didn't want to hear what I had to say and his mind was made up. And possibly he was right, but I felt he wasn't very happy with me." Tanenbaum based her impression solely on

petitioner's demeanor, explaining petitioner was "usually very friendly and smiling, gets along well with people. And he wasn't very happy when I left his office."

We perceive no criminal conduct by petitioner in the portions of the record the district attorney cites. Tanenbaum told petitioner there may or may not be a conflict issue, and petitioner expressed his view there was no problem. Tanenbaum did not ask for petitioner's permission to send the memo requesting a conflicts letter, and the evidence does not suggest petitioner did anything to dissuade her from sending it. That petitioner appeared less friendly and talkative than usual after being informed of a possible conflict of interest should hardly subject him to aider and abettor liability.

> 2. *Failure to Inform the City Council of Tanenbaum's Concerns Regarding a Potential Conflict of Interest*

The district attorney states: "[D]espite [petitioner's] role as the highest-ranking advisor to the city council, petitioner never informed the members of Tanenbaum's concern. . . . Significantly, petitioner maintained this position (and failed to alert the city council to Tanenbaum's concern), even though ONTRAC's legal counsel had declined to provide a legal opinion on the conflict issue, claiming their firm lacked the expertise to render it."

In the grand jury testimony cited, Tanenbaum stated her usual practice in bringing an issue to the city council was to provide a memo to the city council and provide a copy to the city administrator. She explained that she directed memos to the city council because they were her superiors, and that she did not report to the city administrator. Tanenbaum said the conflict memo was "different," because she was acting on her own. Thus, she simply informed petitioner of what she was doing, but did not provide a copy of the memo to either petitioner or the city council. The attorneys to whom Tanenbaum directed the memo never provided an opinion letter, explaining they did not feel qualified to respond.

Petitioner's failure to inform the city council members of Tanenbaum's concerns does not establish sufficient cause to believe petitioner aided and abetted a violation of section 1090. Tanenbaum did not report to petitioner, but reported directly to the city council. Tanenbaum did not tell petitioner a conflict existed, only that she was seeking expert advice to determine if there was a potential problem. Tanenbaum did not provide petitioner with a copy of her memo. More importantly, the question whether the consulting agreement constituted a conflict for Becker presented a legal issue. But Tanenbaum,

not petitioner, acted as the city's attorney. Thus, petitioner's reliance on Tanenbaum's decision to seek a legal opinion before raising the issue with the city council was not unreasonable or suspicious, and does not support an inference of criminal liability.

Similarly, the outside attorneys' decision not to provide a conflicts opinion due to a lack of expertise does not demonstrate an increased likelihood a conflict existed. In any event, any duty to report these developments to the city council rested with Tanenbaum, not petitioner. Accordingly, petitioner's failure to inform the city council about the firm's refusal to provide an opinion letter fails to raise a reasonable suspicion petitioner acted as an aider and abettor.

### 3. *Petitioner Disagreed with the New City Attorney That a Potential Conflict of Interest Existed*

The district attorney asserts: "When another City Attorney replaced Tanenbaum and also pointed out the potentially unlawful conflict of interest, petitioner voiced his disagreement."

The evidence demonstrates only that petitioner disagreed a conflict of interest existed. This conversation, however, came after the new city attorney, Nixon, had already reported his concerns and Becker had resigned his position as director of public works based on Nixon's advice. Thus, petitioner's post hoc expression of his opinion on the matter did nothing to aid or abet Becker. In sum, the evidence concerning petitioner's interactions with the city attorney provides no " ' " 'rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " ' " (*Cummiskey, supra,* 3 Cal.4th at pp. 1026–1027.)

### D. *Insufficient Evidence Supports Count 1 of the Indictment*

Although our analysis above completely disposes of the indictment against petitioner, we additionally note that count 1 of the indictment cannot stand because Becker did not hold a financial interest in the contract specified in that count. Count 1 of the indictment states that Becker and petitioner "did willfully and unlawfully make or cause to be made a contract in which CHRISTOPHER BECKER had a financial interest, namely the 'ORANGE NORTH-AMERICAN TRADE RAIL ACCESS CORRIDOR AUTHORITY JOINT EXERCISE OF POWERS AGREEMENT.' " The district attorney, however, concedes no evidence shows Becker had a financial interest in the ONTRAC agreement distinct from his interest in the Becker and Associates agreement. Instead, the district attorney argues the ONTRAC agreement conferred a "contingent" financial benefit on Becker because it was a

necessary step in gaining the benefits under the Becker and Associates agreement.

 "[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once." (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 349 [211 Cal.Rptr. 742, 696 P.2d 134].) In *Wilkoff*, the defendant had caused an accident while driving under the influence of alcohol in which she killed one person and injured five others. Because six persons were killed or injured, the people charged her with six counts of violating Vehicle Code section 23153, subdivision (a),[5] and six counts of violating subdivision (b).[6] Setting aside 10 of the 12 counts, the Supreme Court held "that one instance of driving under the influence which causes injury to several persons is chargeable as only one count of driving under the influence" because the actus reus of the crime was driving under the influence of alcohol. (38 Cal.3d at p. 353.) The court contrasted the situation there with vehicular manslaughter, in which a defendant may be charged with multiple counts based on a single accident when more than one person was killed. The court noted that the actus reus of vehicular manslaughter was the killing of a human being, while the actus reus of Vehicle Code section 23153 was driving.

Here, the actus reus of section 1090 is being financially interested in a contract. Although the ONTRAC agreement was a necessary step toward Becker obtaining his financial interest in the Becker and Associates contract, there was only a single financial interest, created when ONTRAC later agreed to hire Becker and Associates. Consequently, count 1 of the indictment cannot stand because there is no evidence of a separate financial interest arising from the ONTRAC agreement.

Because the indictment alleges theories of liability precluded either by separation of powers or lack of evidence, we conclude the writ petition should be granted. Consequently, we need not address petitioner's statute of limitations and entrapment defenses.

---

[5] Vehicle Code section 23153, subdivision (a), provides: "It is unlawful for any person, while under the influence of any alcoholic beverage or drug, or under the combined influence of any alcoholic beverage and drug, to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver."

[6] Vehicle Code section 23153, subdivision (b), provides: "It is unlawful for any person, while having 0.08 percent or more, by weight, of alcohol in his or her blood to drive a vehicle and concurrently do any act forbidden by law, or neglect any duty imposed by law in driving the vehicle, which act or neglect proximately causes bodily injury to any person other than the driver."

## III

### Disposition

The petition for writ of prohibition is granted. Let a writ of prohibition issue restraining respondent superior court from taking any further action against petitioner in superior court case No. 06ZF0127 except to dismiss the indictment.

Fybel, J., and Ikola, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied January 14, 2009, S168655. George, C. J., did not participate therein.